## AFFIDAVIT

Your Affiant, DEA Special Agent Niles Gooding, being duly sworn and under oath, states as follows:

1.       I am a law enforcement officer of the United States within the meaning of Title 18, United States Code, Section 2510(7), empowered by law to conduct investigations and make arrests for offenses enumerated in Title 18, United States Code, Section 2516. I am a Special Agent with the Drug Enforcement Administration (DEA), U.S. Department of Justice, and have been employed by the DEA since June of 1990. I am currently stationed in Boise, Idaho. In my capacity as a DEA Special Agent, I have participated in numerous investigations related to trafficking in cocaine, heroin, marijuana, ecstasy and other drugs. I have received 13 weeks of training in the detection and investigation of controlled substances at the FBI Academy in Quantico, VA. I have also successfully completed a 24-hour seminar related to conspiracies which was taught by the DEA, as well as a 40-hour course related to asset forfeiture. Among other duties, I am now responsible for the instant investigation.

2.       Since June of 1990, I have been involved in excess of 400 investigations involving drug, tax, and money laundering violations committed by narcotics traffickers. I have also participated in the preparation and execution of numerous search and seizure warrants. Most commonly, these warrants authorized the search of homes, automobiles, and businesses associated with drug traffickers and their co-conspirators. Materials searched for and recovered in these locations have included packaging materials, scales, weapons, and documents and papers reflecting the identity of co-conspirator associates, the distribution and possession of ecstasy, LSD, methamphetamine, cocaine, marijuana, other designer drugs, etc., and the receipt, investment, and concealment of proceeds derived from the possession and distribution of these

1

said narcotics.

3.      During the period 1990 through 2000, I was assigned to the Seattle Field Division where I worked in the intelligence group, the "weed and speed" enforcement group, the asset forfeiture unit, the Mobile Enforcement Team (MET), the gang task force and the High Intensity Drug Trafficking Area Task Force (HIDTA) in the Western District of Washington. For the past 12 years, I have been assigned to the Boise Resident Office where I have worked on general enforcement cases in the Judicial District of Idaho and elsewhere. I have worked closely with agents of the Federal Bureau of Investigation (FBI), Bureau of Immigration and Customs Enforcement (BICE), IRS-CI and state and local law enforcement officers concerning documentation of drug proceeds.

4.      During my tenure with the DEA, I have also participated in numerous narcotic and money laundering investigations during which I have conducted physical and wire surveillance. I have been the Affiant in T-III investigations (wiretaps), and applications and execution of search warrants. I have reviewed taped conversations, and analyzed drug-trafficking records. Therefore, I am familiar with the manner in which illegal drugs are imported and distributed, the method of payment for such drugs, and the efforts of persons involved in such activity to avoid detection by law enforcement, as well as methods used to finance drug transactions and launder drug proceeds.

5.      Based upon the facts contained in this affidavit and my experience, I believe there is probable cause to conclude that the subject premises contain evidence of violations of federal law, including violations of Title 21, United States Code, Sections 813 and 841 (manufacture, distribution and possession with intent to distribute controlled substance analogues); Sections 846, 813 and 841 (conspiracy to manufacture, distribute and possess with intent to distribute

Case 1:12-mj-07292-CWD *SEALED*   Document 2 (Court only)   Filed 05/09/12   Page 5 of 40

controlled substance analogues); Sections 846 and 863 (conspiracy to sell, to offer for sale, and to transport drug paraphernalia); Section 843(b) (use of a telephone to facilitate drug crimes); Section 854 (investment of illicit drug profits); Section 856 (leasing, renting, using or maintaining drug-involved premises, and managing or controlling property for the purpose of committing or allowing federal drug offenses); Section 863 (selling, offering for sale, and transportation of drug paraphernalia); Section 863(a)(2)(use of mails or other facilities in interstate commerce to transport drug paraphernalia); Title 18, United States Code, Section 1952 (use of facilities in interstate and foreign commerce to promote and carry on unlawful activity, including the violation of federal and state controlled substance laws); Sections 1956 (money laundering) and 1957 (engaging in monetary transactions in property derived from specified unlawful activity); and Title 31, United States Code, Section 5324 (structuring of financial transactions).

6.   I am familiar with the facts and circumstances set forth in this affidavit as a result of my own personal observations, my training and experience, examination of relevant documents, interviews with persons named in this document, and information provided to me by a number of other federal, state and local law enforcement officers. Based upon my own observations, and the observations of other law enforcement officers involved in this investigation, this affidavit is made in support of an application for a search warrant to search the following subject premises in connection with an investigation into the illegal activities set out above.

**BUSINESS:**

7.   The **OTHER WORLD GALLERY**, a business located at 108 South 11th Street, Boise, Idaho, MORE PARTICULARLY DESCRIBED IN ATTACHED EXHIBIT A

(PROPERTY TO BE SEARCHED).

**RESIDENCES AND OTHER BUILDINGS:**

8.    The house, premises and outbuildings of **CRYSTAL and THOMAS BLUMKE**, located at:                              **HORSESHOE BEND, IDAHO,** MORE PARTICULARLY DESCRIBED IN ATTACHED EXHIBIT B (PROPERTY TO BE SEARCHED).

9.    This affidavit is also made in support of a request for criminal seizure warrants authorized under 21 U.S.C. § 853(f) and, as support therefore, your affiant asserts the following: (1) there is probable cause to believe that the property sought to be seized herein would, in the event of conviction of any of the named defendants, be subject to forfeiture; and (2) an order under 21 U.S.C. § 853(e) may not be sufficient to assure the availability of the property for forfeiture at the time of conviction, in that the property consists of items of drug paraphernalia, and other properties in the possession of the defendants or their agents, and which could easily be removed, secreted, transferred, concealed, dissipated, or otherwise made unavailable for forfeiture by the Court.  As further support, your affiant states that an indictment which names the described property as subject to forfeiture in the criminal proceeding, and finds probable cause therefor, has been returned by a federal grand jury in the District of Idaho on or about May 9, 2012.

**I.  INTRODUCTION.**

10.    Over my years as a Special Agent, I have made many arrests investigating violations of drug laws.  I have acted numerous times in the role of an undercover officer.  I have also interviewed many drug users, dealers and addicts, thereby acquiring knowledge of current methods of using, ingesting, and trafficking drugs.  I am familiar with the manner in which drugs are packaged for resale and use, as well as items of drug paraphernalia commonly associated

4

Case 1:12-mj-07292-CWD *SEALED*   Document 2 (Court only)   Filed 05/09/12   Page 7 of 40

with the sale and use of drugs including methamphetamine, cocaine, marijuana, hashish, hashish oil, PCP, heroin, ecstasy, LSD, "spice" and other drugs to include "designer drugs." I am also familiar with illegal controlled-substance analogues, such as "Spice" and "Bath Salts," which I have observed for sale at certain stores, and I have observed and/or seized items of drug paraphernalia, as described below, on numerous occasions.

11.    Beginning in November 2011, your affiant began an investigation into the sale of drug paraphernalia in Boise and Nampa, Idaho. At that time, the Boise Police Department, Nampa Police Department and the Ada County Sheriff's Office had already received citizen complaints regarding the sale of drug paraphernalia at numerous locations in Boise, Kuna and Nampa. In addition, the same law enforcement agencies were also receiving numerous citizen complaints regarding the sale of "Spice." "Spice" is a synthetic cannabis which is a psychoactive herbal and chemical product that, when consumed, mimics the effects of cannabis.

12.    In approximately 2011, the sale of Spice in the United States began to receive a lot of attention in the media, and with law enforcement, because of the potentially devastating impact of consumption. In the spring of 2011, the Idaho Legislature made the sale of Spice illegal. In March of 2011, the Drug Enforcement Administration (DEA) placed five synthetic cannabinoids into Schedule I of the CSA (Controlled Substances Act). Later in February of 2012, there was an extension, found under 21 CFR Part 1308, of temporary placement of these same five synthetic cannabinoids into Schedule I of the Controlled Substances Act. These synthetic cannabinoids are JWH-018, JWH-073, JWH-200, CP-47,497 and CP-47, 497 C8 homologue. As a result of this action by the DEA many manufactures of Spice started to change the chemicals being used to manufacture spice. One chemical that started to replace JWH-018 was AM-2201. After analysis of AM-2201, the DEA determined that it was so similar in

Case 1:12-mj-07292-CWD *SEALED*   Document 2 (Court only)   Filed 05/09/12   Page 8 of 40

chemical structure to JWH-018 that persons found using AM-2201 in the production of Spice could be charged under Title 21, United States Code, Section 813 (treatment of controlled substance analogues). Therefore, the sale of spice utilizing the chemical AM-2201 is illegal under federal law. Despite these laws, many drug paraphernalia stores continue to sell spice claiming that their particular version does not have the same chemical makeup, and is therefore legal.

13.     Based upon these citizen complaints your affiant began to work with local law enforcement agencies to identify those businesses selling drug paraphernalia in violation of Title 21, United States Code, Section 863 as well as those businesses selling Spice in violation of Title 21, United States Code, Section 813. One of these locations was identified as "OTHER WORLD GALLERY," a business located at 108 South 11th Street, Boise, Idaho.

14.     My ongoing investigation has resulted in the identification of more than twelve drug paraphernalia stores that are operating in the state of Idaho. The details of my investigation regarding OTHER WORLD GALLERY are contained in greater detail below.

To date, this investigation has shown the following:

15.     There are a number of businesses operating in the District of Idaho that are commonly referred to as "head shops" - businesses engaged in the unlawful sale of drug paraphernalia to drug users and drug traffickers; many of these businesses also sell "Spice." Items of drug paraphernalia are typically sold under the guise of "tobacco products," or with claims of other "legitimate" uses. The drug paraphernalia includes elaborate bongs, water pipes, methamphetamine (crank) and cocaine (crack) pipes, glass vials with small snorting spoons attached, scales, cutting agents, hide-a-pipes, carburetor pipes, electric pipes, hookahs, chillums, grinders, drug-masking agents, urine-cleansing kits, wired-cigarette papers and roach clips.

Case 1:12-mj-07292-CWD *SEALED*   Document 2 (Court only)   Filed 05/09/12   Page 9 of 40

16.   Owners, managers and employees of these businesses refer too many of these items of drug paraphernalia as "smoking accessories," to be used only to smoke tobacco or snuff (a rarely used mixture of finely pulverized tobacco which can be inhaled).  However, virtually all of the smoking devices sold by these stores are commonly used to ingest methamphetamine, cocaine, marijuana, hashish, heroin, and/or other illegal drugs - not tobacco.  As further evidence of their illegal purpose, many of these smoking devices are elaborately disguised as common items such as lipstick, highlighter pens, wooden boxes, lighters and ceramic cigarettes.  Other drug related items sold by these businesses are commonly used by drug traffickers to weigh, dilute, and "cut" powdered drugs such as methamphetamine and cocaine.  Masking and cleansing agents are sold to people wishing to pass drug tests, thereby concealing the presence of illegal drugs in their body.  Oftentimes, when a customer of these businesses asks for an item using a drug term (such as "meth pipe" or "bong"), the customers are directed to use another name, such as "water pipe."  In many instances when a customer uses the word "bong" the employees or owners of the store tell the customer not to use the "B" word. In several of the head shops in the Boise, Nampa and Kuna area, signs are posted inside the store telling customers not to use the word "bong" and if they do, it may result in them being kicked out of the store.  Many items of drug paraphernalia have a similar code name to disguise their real purpose.

17.   I know that drug paraphernalia is defined in Title 21, United States Code, Section 863(d), as any equipment, product, or material of any kind which is primarily intended or designed for use in manufacturing, compounding, converting, concealing, producing, processing, preparing, injecting, ingesting, inhaling, or otherwise introducing illegal drugs such as methamphetamine, cocaine, marijuana, hashish, hashish oil, PCP, and heroin into the

human body.  It includes items primarily intended or designed for use in ingesting, inhaling, or

otherwise introducing methamphetamine, cocaine, marijuana, hashish, hashish oil, PCP, or

amphetamines into the human body, such as: metal, wooden, acrylic, glass, stone, plastic, or

ceramic pipes with or without screens, permanent screens, hashish heads, or punctured metal

bowls; water pipes; carburetion tubes and devices; smoking and carburetion masks; roach

clips: meaning objects used to hold burning material, such as a marijuana cigarette, that has

become too small or too short to be held in the hand; miniature spoons with level capacities of

one-tenth cubic centimeter or less; chamber pipes; carburetor pipes; electric pipes; air-driven

pipes; chillums; bongs; ice pipes or chillers; wired cigarette papers; or cocaine freebase kits.

See 21 U.S.C. § 863(sale, offering for sale, and transportation of drug paraphernalia).

18.    Drug paraphernalia comes in many shapes, sizes and designs.  Various terms

identify different kinds of paraphernalia, a few of which include the following: "bong" is a

sealed chamber partially filled with water which is used to smoke marijuana.  Smoke from the

burning marijuana enters the water chamber, where it is cooled and forced deeply into the

lungs by increasing and decreasing the air pressure in the bong.  "Water pipes" are used to

draw marijuana smoke through water before reaching the lungs.  A "chillum" is a narrow

funnel, typically made out of glass, clay and other materials, which is used to smoke

marijuana. "Grinders" are used to prepare methamphetamine, cocaine, marijuana and other

drugs for use. "Hookah" is the term for a water pipe with flexible tubes extending from the

main chamber to multiple mouth pieces.  "Wired rolling paper" refers to papers used to roll

marijuana joints.  A thin wire which runs throughout the paper acts as a built-in roach clip.  A

roach clip is used to hold the end of a marijuana joint without burning the fingers.  The term

"420" is a commonly used term understood in the drug culture as a time to smoke marijuana.

Case 1:12-mj-07292-CWD *SEALED*   Document 2 (Court only)   Filed 05/09/12   Page 11 of 40

A dugout is a small portable smoking instrument. This small container is "dugout" inside as a storage area for marijuana. It also has a space for a one-hit pipe inside. The person presses the cavity of the one-hit pipe into marijuana to fill it and then it is lit like a cigarette and inhaled steadily until everything is smoked. The person only gets one inhalation per filling; therefore, this instrument is also called a one-hit.

## II. PROBABLE CAUSE PER LOCATION

19.     The following businesses and individuals have been identified as sellers of illegal drug such as "Spice" and drug paraphernalia:

## OTHER WORLD GALLERY (Boise, Idaho)

20.     **OTHER WORLD GALLERY** is a business located at 108 South 11th Street, in the City of Boise, in the County of Ada, Idaho. This business is located in a business complex on the 100 block of South 11th Street in Boise, Idaho. The complex is positioned on the east side of 11th Street and the main entrance faces west toward the street. The business is positioned between the address of 106 South 11th and the alley which runs east and west. The front entrance is a glass door with metal framing and the numbers 108 are prominently displayed in gold lettering on this front door. There are three large glass windows to the right of the front door when facing it with three smaller windows above the larger ones. The words "OTHER WORLD GALLERY" are displayed in these smaller windows in green and yellow lettering. There is also a smaller elevated window to the left of the front door when facing it.

21.     Based upon your affiant's investigation, I know that **Thomas BLUMKE** is the owner based on information obtained from the Idaho Secretary of State. According to the Idaho Secretary of State, Thomas BLUMKE is the owner of OTHER WORLD GALLERY LLC, and

Case 1:12-mj-07292-CWD *SEALED*   Document 2 (Court only)   Filed 05/09/12   Page 12 of 40

Crystal BLUMKE is the member or manager.  OTHER WORLD GALLERY LLC was established on or about 10/11/2011.

22.     On January 17, 2012, Detective Coy Bruner and Detective Joe Andreoli responded to the area of 108 South 11th Street, Boise, Idaho and observed the store at that location that had signage identifying it as "OTHER WORLD GALLERY."  Detective Bruner entered this store to determine if it in fact was selling items considered to be drug paraphernalia consistent with a head shop.  Upon entering the store, Detective Andreoli was greeted by a female who later identified herself as BLUMKE.  BLUMKE was later learned to be Crystal BLUMKE, the manager of OTHER WORLD GALERY.  BLUMKE's husband, Thomas BLUMKE is listed as the registered agent of the business on the Certificate of Organization for the LLC.

23.     Inside the main room in the store, Detective Andreoli observed several pieces of artistic glass work displayed like a sort of art gallery.  BLUMKE described to Detective Andreoli many of the pieces, as well as the artists whose work was displayed inside the store.  BLUMKE then went on to explain that she also has an "18 and over section" in the back of the store.  BLUMKE advised that both Detective Bruner and Detective Andreoli appeared to be over the age of 18 and invited them to the back.

24.     Upon entering the back of the store, Detective Andreoli observed two to three glass cases which were filled with various glass pipes, water pipes, etc., all consistent with the types of pipes used for smoking marijuana.  Detective Andreoli also observed larger bongs/water pipes displayed behind the counter as well as lighters, a few small hookahs, various items and plastic zip loc baggies labeled "Smelly Proof."

25.     Detective Andreoli allowed BLUMKE to show him various pipes including several that she claimed to have designed.  BLUMKE showed him a large pipe that had a separate but attached chamber which she identified as being able to store your "material." BLUMKE asked if we had ever been in a situation where we wanted to smoke, but couldn't find our product, or didn't want to get up to get it.  BLUMKE continued by saying that this way, we would always have the product with us.

26.     BLUMKE also showed us smaller glass pipes that had a knob which turned on a color changing LED light which lights up the pipe.  BLUMKE advised that she came up with this idea because she likes to go camping and likes to smoke while camping.  The light-up pipe makes it easier to find her pipe when she is camping.

27.     Detective Bruner asked BLUMKE about "potpourri."  BLUMKE stated that her shop doesn't sell such products but recommended "THE SMOKE SHACK" as having the best potpourri for sale in the valley.

28.     While continuing to show us the various pipes, BLUMKE advised us that she is a medical marijuana patient, therefore justifying her use of these types of smoking devices. BLUMKE acknowledged that her medical marijuana permit is not recognized in the State of Idaho and, therefore, advised that she has to be careful when selling these types of products in this state.  BLUMKE continued on a bit of a rant about "conservative Idaho."  BLUMKE went on to say that she was raised around the marijuana culture.  BLUMKE advised that she is from California.  She complained that her father, who has since passed away, was facing his "third strike" in California simply for marijuana sales.  BLUMKE advised that the culture surrounding marijuana use is her spirituality.

Case 1:12-mj-07292-CWD *SEALED*   Document 2 (Court only)   Filed 05/09/12   Page 14 of 40

29.     Detective Andreoli brought the bags labeled "Smelly Proof" to BLUMKE's attention and asked if they actually work. BLUMKE grabbed a couple of the bags for Detective Bruner and Detective Andreoli to look at while she explained the bag. BLUMKE stated that these bags work great. BLUMKE advised of a time that she was driving through the state of Oregon, carrying her marijuana in one of these "Smelly Proof" bags. BLUMKE stated that she was stopped by local police and her vehicle was searched by officers as well as a canine. BLUMKE bragged that neither the officers nor the drug dog found her marijuana because it was stored inside one of these "Smelly Proof" bags. This store carries two different sizes of these bags. BLUMKE stated that she provides customers with one of these bags for free with every purchase. BLUMKE thanked us for coming into the shop and provided both Detective Bruner and Detective Andreoli with two "Smelly Proof" baggies, one of each size. Detective Andreoli observed that there was a sign near the baggies listing the sale price of $2.50 each.

30.     It should be noted that BLUMKE's husband, "Tom" entered the store while the detectives were there. Tom also engaged the detectives in conversation about the products for sale. BLUMKE admitted that Tom is responsible for the back portion of the store, and referred to it as Tom's "man cave." When asking about certain products inside this section of the store, BLUMKE would defer to Tom regarding prices.

31.     Both BLUMKE and Tom thanked the detectives for coming into the store and invited us back. BLUMKE advised that on days she has a model in the store displaying the products, she offers all items at a sale price. BLUMKE handed Detective Andreoli a flyer for the shop which referred to the pipes as "18 + Tobacco Pipes, Hookahs."

32.     On 2/2/2012, at approximately 5:05 p.m., Detective Andreoli and Detective Clark entered the OTHER WORLD GALLERY, located at 108 South 11th Street, Boise, Idaho. Upon

entering the store Detective Clark noticed a fairly large inventory of small collectable glass items in the main portion of the store. To the rear of the store was a smaller room with limited access to those patrons over the age of 18.

33.    Detective Andreoli and Detective Clark were greeted by the owner of the store, Crystal BLUMKE. Crystal allowed Detective Andreoli and Detective Clark access to the rear portion of store. Upon entering this room Detective Clark observed a series of glass display cases containing glassware markedly different from the glass collectables displayed in the main portion of the store. The display cases contained glass smoking devices of varying sizes, shapes and colors. These types of smoking devices, based on Detective Clark's training and experience, are consistent with drug paraphernalia used for smoking cannabis.

34.    Detective Clark observed a very small inventory of what he knew to be traditional Hookah style smoking devices. These devices were displayed separately from the glass smoking devices in the display cases.

35.    Crystal's husband, Tom BLUMKE, was also present in the back room. Crystal showcased her glassware to Detective Andreoli and Detective Clark. She showed Detective Clark a champagne style glass with a stem and base that doubles as a pipe. Crystal was cautious and deliberate when stating that tobacco was the product to be smoked by this device. Crystal showed Detective Clark a glass bowl that contained LED lights. Crystal explained that the lights can come in handy in case you "lose your shit."

36.    Crystal explained the store's policy on returned glassware, stating that it must be cleaned. She said that she didn't want the dirty glassware in her store, implying that "dirty" glassware was coated with illegal substances. She further explained that she was "not going to call anyone" if a customer did bring in a "dirty" piece of glassware. Detective Clark took this as

a strong indication that Crystal was well aware of the intended use of the glassware that she had for sale. Crystal also began a pseudo philosophical discussion about the beauty of glassware and that she would be willing to discuss with anyone the differences between paraphernalia and art.

37.    Crystal informed the detectives that she is a medical-marijuana patient. Crystal said that she is a patient at the 45th Parallel, which is a marijuana dispensary in Oregon. Detective Andreoli told Crystal that he too is a medical-marijuana patient at the 45th Parallel. Detective Andreoli inquired about receiving a discount for glassware as a result of being a medical-marijuana patient. Crystal and Tom both said that by providing a discount to medical-marijuana patients, it would imply that they know that their customers are using the glassware to smoke marijuana, which would make it illegal. They subsequently agreed to give Detective Andreoli a discount for the sake of giving him a discount.

38.    Detective Clark inquired about some small plastic Ziploc style bags that Crystal had on display. Crystal explained that the "Smelly Proof" bags would hide the odor of what was placed inside. Crystal gave testimony to the fact that she places her "medicine" inside of the bag and when she opens the bag the scent will overwhelm the room. From a previous conversation Detective Clark knew that Crystal's "medicine" was marijuana. Detective Clark asked if the bags would hide the odor from dogs, indicating drug-sniffing canines. They indicated that they "knew what Detective Clark was getting at" and Crystal was fairly certain that the bags would be "dog proof."

39.    As mentioned earlier, the large majority of the glassware displayed in the back room was consistent with drug paraphernalia. None of the items displayed are commonly used or associated with traditional tobacco smoking, despite the seller's claims. Crystal and Tom BLUMKE showed Detective Clark a piece of glassware that they referred to as the "Gandolf."

14

This device contained a port for a smaller pipe in the event that 2 people wanted to "share" the product.

40.    Detective Clark decided to purchase a small glass smoking device that Crystal had for sale. The original price was $25 for the glass pipe; however, Crystal decided to give Detective Clark a 15% discount. Crystal also gave the detectives, free of charge, 2 "Smelly Proof" bags.

41.    On 3/22/2012, Detectives Joe Andreoli, Coy Bruner and Kelley Clark entered OTHER WORLD GALLERY located at 108 South 11th Street, Boise, Idaho.

42.    Open entering the business the detectives were greeted by the owner of the establishment, Crystal BLUMKE. Detective Clark recognized BLUMKE from a previous transaction at her establishment while working in an undercover capacity. Crystal's husband, Thomas BLUMKE, was also in the store. Detective Andreoli asked BLUMKE if they had received anything new, to which BLUMKE said yes and escorted the detectives to the rear portion of store that contains the glass smoking devices.

43.    BLUMKE showed the detectives some of the new glassware that they had recently received. BLUMKE explains where the new glassware came from and who did the glass blowing. BLUMKE told of a glass blower from Hawaii named "Stoney." She explained that Stoney had license plates that say "Stoney" and a glass stamp with "Stoney." She talked about Stoney making glass blunts for water pipes. Detective Clark jestingly ask why his name is "Stoney." BLUMKE jokingly said it's because he likes stones and that he lives in Hawaii and there are stones everywhere.

44.    Based on his training and experience it was clear to Detective Clark that the glass smoking devices displayed and sold at OTHER WORLD GALLERY are not used or associated

with traditional tobacco consumption. These types of glass smoking devices and water pipes are very commonly associated with smoking cannabis.

45.    Detective Kelley asked BLUMKE about potpourri and she stated that they do not sell it at their store. She told the detectives that she is the only smart one and does not do business in Idaho and that she plays nationally. She said something to the effect that she is the only one with something legal in this state; however, does not sell it in this state. Detective Clark understood her to mean that she sells "potpourri" in other states however not the state of Idaho. BLUMKE mentioned that she is the one who created "SMOKE SHACK" and wrote the label for "PULSE" and created their "Ultra" brand "potpourri." BLUMKE explained that she told them to switch to "Lunar" and that they did not listen. She said that she no longer does business with them. She said that she can no longer say that their product is legal. BLUMKE also educated the detectives on a base test for "potpourri" and that the detectives need to start looking for non-cannabinoids.

46.    Detective Clark inquired about "Smelly Proof" bags that he had received on a previous transaction while working in an undercover capacity. The "Smelly Proof" bags are designed to hide the odor of marijuana and allegedly can be used to avoid detection by drug-sniffing canines. BLUMKE provided all three of the detectives complimentary "Smelly Proof" bags free of charge. She also provided Detective Bruner with a small metal keychain pipe.

47.    Detective Clark purchased a small glass smoking pipe that had the traditional Rastafarian colors (black, red, yellow and green). The Rastafarian culture is very well known for its embrace and use of cannabis. Detective Clark purchased this pipe for $25.

48.    On 4/11/2012, Detective Joe Andreoli requested that Detective Jason Harmon utilize his state certified narcotics detecting K9, "Huck," and perform a sniff on a 1995 Pontiac

Case 1:12-mj-07292-CWD *SEALED*    Document 2 (Court only)    Filed 05/09/12    Page 19 of 40

van bearing Idaho plate ). The registration showed that the vehicle was registered to Crystal and Thomas BLUMKE at Horseshoe Bend, Idaho. The vehicle was parked in the parking lot located on the South East corner of 11th Street and Grove Street. Detective Andreoli requested the K-9 sniff because while conducting surveillance on this vehicle, he had observed both Crystal and Thomas BLUMKE enter the vehicle at different times and appear to start smoking. Detective Andreoli became suspicious that they were smoking marijuana based upon their suspicious actions such as leaning the seat all the way back in the van so that they could not be seen from a normal observer. Huck is a nine-year-old black Labrador/Border Collie mix that is state certified and trained to sniff for, and alert to, the odors of marijuana, methamphetamine, cocaine, and heroin.

48.    Detective Harmon deployed Huck and began working from the front passenger's side of the vehicle, counter clockwise. When Huck reached the front passenger's side door Detective Harmon watched as he sniffed the front passenger's door handle. Huck's breathing became more rapid and the tempo of his wagging tail increased. Huck then came to a final resting position, which is defined as a sit, quivering and staring at Detective Harmon excitedly with his ears perked up. From training and working with Huck, Detective Harmon knows this alert and particular change in behavior to be consistent with past alerts were narcotics were found, or had been present in the past.

49.    Detective Harmon continued the counter clock wise pattern around the vehicle. When Huck reached the front driver's side door he began to sniff the door handle, Huck had a distinct change in behavior while sniffing the door handle. His breathing became more rapid and once again the tempo of his wagging tail increased. Huck came to a sitting position and once again exhibited the same behavior changes that accompanied the alert on the passenger's side

17

Case 1:12-mj-07292-CWD *SEALED*   Document 2 (Court only)   Filed 05/09/12   Page 20 of 40

door handle.

### Residence of CRYTAL and THOMAS BLUMKE located at
### Horseshoe Bend, Idaho

50.          **Horseshoe Bend, Idaho** is a multi story, single family dwelling of frame construction and tan in color with green trim. The exterior of the residence appears to be constructed of tan-colored stucco with a red-colored, asphalt-shingle roof. On the main portion of the residence sits a "crow's nest" type of structure with glass windows. The residence sits at the end of a gravel driveway, off of          to the north, with          displayed on a wooden post at the entrance of the driveway. On the north side of the house is a very open, large garage, with no garage door, similar to an airplane hangar. There were no numbers observed on the residence.

51.     On 4/4/2012, while attempting to obtain a physical description of the business OTHER WORLD GALLERY, located at 108 South 11th Street, Boise, Idaho, Special Agent Bloxam and Detective Joe Andreoli were parked on the 100 block of South 11th Street.

52.     During this time, both observed Crystal BLUMKE, owner of OTHER WORLD GALLERY, exit the store and cross 11th Street to a blue-colored Pontiac van bearing Idaho registration          , which was parked on the west side of the street. BLUMKE entered the rear sliding door of the van on the passenger side and entered. Special Agent Bloxham and Detective Andreoli continued to watch as BLUMKE lit a smoking device, resembling a joint or cigarette. BLUMKE then lay down in the back seat of this van and continued smoking it, making a conscious effort to keep out of public view while she smoked. After several minutes inside the van, BLUMKE exited and returned inside the store.

53.     Less than two minutes later, Thomas BLUMKE exited the store, crossed the street and entered the same van; however, he entered the front-passenger seat. Thomas BLUMKE also began smoking something; however, it was obvious that when he inhaled from the smoking device, he would bend over out of public view. After several minutes, Thomas BLUMKE exited the van and returned to the store.

54.     Special Agent Bloxham and Detective Andreoli exited the area. Detective Andreoli later returned with BPD Officer Scott Nicholls. Detective Andreoli observed Thomas BLUMKE make two more trips to the front passenger seat of the van and continue the same actions as before.

55.     On 4/11/2012, Detectives Jason Harmon, Kevin Holtry, Sergeant Mike Harrington, and Joe Andreoli began surveillance of OTHER WORLD GALLERY. The purpose of this surveillance was to follow the BLUMKEs after leaving the store to determine where they were living. The same van bearing Idaho registration          was parked in a parking lot on the south east corner of the intersection of 11th and Grove. Upon arrival, Thomas BLUMKE was seated in the driver's seat of this vehicle; however, Detective Andreoli was unable to observe his actions. Thomas BLUMKE returned to the store, and then made an additional trip to the vehicle a little while later. On this occasion, Thomas BLUMKE sat in the passenger seat of the vehicle for approximately 5 minutes then returned to the store.

56.     Once Thomas BLUMKE entered the store, Detective Andreoli requested that Detective Harmon utilize his drug certified K9 "Huck" and conduct a sniff of the exterior of the vehicle while parked in the public lot. Detective Harmon did complete this sniff and later informed him that Huck had alerted on both the driver's and passengers doors.

Case 1:12-mj-07292-CWD *SEALED*   Document 2 (Court only)   Filed 05/09/12   Page 22 of 40

57.     Both Crystal and Thomas BLUMKE ultimately exited the store after closing it for the evening. They returned to their vehicle, Thomas in the driver's seat and Crystal in the passenger seat. Surveillance was conducted on the BLUMKE's as they drove through Boise to Highway 55, then north on Highway 55. Based on a registration check of the vehicle they were driving, Detective Andreoli requested that Detective Clark respond to                    in Horseshoe Bend, Idaho to attempt to determine if they do reside at the registered address. Detective Clark obtained photographs of the residence and was able to maintain visual of the property to be able to confirm the BLUMKE's arrival.

58.     The BLUMKE's continued north on Highway 55 to their eventual turn off on Summit Ridge Road which leads to                    . Detective Clark, still in position near the residence was able to confirm that Thomas and Crystal BLUMKE arrived at the residence of              in Horseshoe Bend, Idaho.

### AFFIANT'S EXPERIENCE

59.     Your affiant has been investigating businesses that sell drug paraphernalia, including those listed in this affidavit, since November of 2011. In addition, I participated in a similar investigation in 2003 in Idaho where businesses involved in the sale of paraphernalia were shut down and the owners arrested and charged with 21 U.S.C. § 863, as well as other federal violations. During the 2003 investigation, I participated in search warrants of drug paraphernalia businesses. These search warrants allowed me to seize and analyze numerous additional items of drug paraphernalia, drug-paraphernalia manufacturing equipment, and documents relating to the business of drug-paraphernalia sales.

60.     During this investigation, I have consulted with agents and officers of the DEA, IRS/CID, and various other federal, state and local police agencies. During my career I have

interviewed numerous employees and customers of these types of businesses. Also, in my general narcotics investigations, I have discussed drug paraphernalia and head shops with numerous drug users and traffickers.

61.     As described in this affidavit, your affiant and other officers in this investigation have visited the business to be searched pursuant to this warrant and determined that it sells and offers for sale various items of items of drug paraphernalia which include some of the paraphernalia items listed in Title 21, United States Code, Section 863:

a.     Items of drug paraphernalia, including equipment, product, and material of any kind which is primarily intended or designed for use in manufacturing, compounding, converting, concealing, producing, processing, preparing, injecting, ingesting, inhaling, and/or otherwise introducing illegal drugs into the human body such as methamphetamine, cocaine, marijuana, hashish, hashish oil, PCP, heroin and/or other controlled substances under Title 21 of the United States Code, such as

(1)     metal, wooden, acrylic, glass, stone, plastic, or ceramic pipes with or without screens, permanent screens, hashish heads, or punctured metal bowls;

(2)     water pipes;

(3)     tubes and devices;

(4)     smoking and carburetion masks;

(5)     roach clips: meaning objects used to hold burning material, such as a marijuana cigarette, that has become too small or too short to be held in the hand;

(6)     miniature spoons with level capacities of one-tenth cubic centimeter or

less;

(7)    chamber pipes;

(8)    carburetor pipes;

(9)    electric pipes;

(10)    air-driven pipes;

(11)    chillums;

(12)    bongs;

(13)    ice pipes or chillers;

(14)    wired cigarette papers; and,

(15)    cocaine freebase kits.

62.    Based on this investigation and previous investigations your affiant has been involved with, I also anticipate that other paraphernalia items and related materials, including materials described in Title 21, United States Code, Section 863, are likely to be found at the subject premises, including:

a.    Items and other material useful in determining whether specified items constitute drug paraphernalia, including:

(1)    instructions provided with drug paraphernalia concerning its use;

(2)    descriptive materials accompanying drug paraphernalia that explain or depict its use;

(3)    displays or packaging for drug paraphernalia;

(4)    detoxifying agents intended to conceal drug use and assist the user in passing a drug test or otherwise flush illegal drugs from the user's system;

(5)    hide-a-pipes, dugouts, stash cans or other devices designed to conceal

drugs and drug paraphernalia;

   (6)   cutting agents, which are substances that are added to controlled substances, to increase the quantity for distribution purposes;

   (7)   scales for weighing controlled substances; and,

   (8)   baggies and heat sealers for packaging controlled substances.

b.   Equipment, tools, machinery, raw materials, components, products and/or supplies used in the manufacture, sale and/or distribution of items of drug paraphernalia; examples include, but are not limited to, raw glass, such as rods or beads, clay, molds, kilns, hardware, saws, drill presses, sanders, paints and painting supplies, printers, and/or packaging equipment;

c.   Items of merchandise that, although they are not items of drug paraphernalia per se, which demonstrate knowledge that the per se items are to be used in the consumption of controlled substances; this includes, but is not limited to, items with references to illegal drugs or with drug related symbols which show the intent to sell, offer for sale, transport or manufacture drug paraphernalia; such items would include, but not be limited to, tee shirts, stickers, posters, signs, books encouraging or instructing drug use, or other objects that display drug references, such as, 420, ganja, dank, eight-ball, or drug symbols, such as, marijuana leaves, mushrooms, blood shot eyes and other known drug references or symbols, and specifically including items associated with the sale and offer for sale of "Spice" and "Bath Salts" and other illegal analogues.

23

Case 1:12-mj-07292-CWD *SEALED*   Document 2 (Court only)   Filed 05/09/12   Page 26 of 40

63.     As a result of your affiant's experience in this investigation, your affiant's prior experience in numerous drug and paraphernalia related investigations, your affiant's training, and your affiant's conversations and consultations with officers and analysts on this case, your affiant knows the following:

64.     The business listed in this affidavit (subject premises) sells illegal drug paraphernalia, as well as some legitimate items such as t-shirts and posters. In my experience, businesses that sell contraband, such as drugs or drug paraphernalia, often commingle legitimate and illegitimate income. This is usually done to intentionally "launder" the proceeds from the sales of contraband. However, it can also occur simply as the result of a business selling both contraband and legal products. In either event, the illegal or contraband-side of the business permeates the entire business, thereby also permeating records relating to the business and to the people running the business. In any situation involving money laundering or commingling of proceeds, one must be able to look at the entire financial records of the business and the individuals running the business in order to identify the illegitimate income that constitutes proceeds of crime.

65.     In addition to commingling their proceeds, your affiant knows that sellers of contraband also often conceal contraband, the proceeds of the contraband, and evidence of the contraband by placing them in areas where they cannot readily be found or identified with the business or with the people managing the business. It is common for sellers of contraband to use foreign or domestic banks, with all their attendant services, brokerage houses, and other offsite locations, such as safety deposit boxes and commercial storage lockers. In so doing, they often utilize aliases or names of co-conspirators, or names of non-existent shell corporations to hide the proceeds of crime.

Case 1:12-mj-07292-CWD *SEALED*   Document 2 (Court only)   Filed 05/09/12   Page 27 of 40

66.      Your affiant knows that sellers of drug paraphernalia often obtain the paraphernalia from local and out-of-state suppliers that carry on business in a manner similar to legitimate businesses.  As a result, evidence of the purchase or sale of drug paraphernalia will be found in documents reflecting transactions with wholesalers and suppliers, such as, invoices, order forms, shipping records, catalogs, business cards, receipts, credit card bills, other bills, solicitations, brochures, telephone records and bills and photographs or descriptions of products.

67.      Your affiant knows that many sellers of contraband, including drugs and drug paraphernalia, also engage in the distribution, manufacture or assembly of contraband for sales. Your affiant knows that those involved in the paraphernalia business commonly have raw materials, such as glass beads, clay, molds, hardware, such as screws, smoking bowls and pipe connectors and other objects or materials evidencing the manufacture of paraphernalia.  They also may have instructions for the manufacture, assembly or use of such paraphernalia.

68.      Those who sell or manufacture drugs or drug paraphernalia commonly acquire a large amount of cash and assets through their criminal activities since purchasers of illegal products are often wary of the use of personal checks or credit cards.  They maintain on hand U.S. currency in order to maintain and finance their ongoing illegal activities, to support business "fronts," pay bills, acquire assets or inventory, make other purchases, or otherwise promote their illegal activities.  Smaller purchases are often made with currency; larger purchases may be made with cashier's checks, money orders, or, to shield such "investments" from tracing and/or forfeiture, with funds passed through business checking accounts or through "nominee" parties. They often use other persons, including friends, family members, spouses or business partners, to act as third-party nominee owners to acquire and/or hold assets which are purchased with illegal drug proceeds.  Such nominee parties may even maintain possession, as well as title and/or

registration to such assets.

69.     Persons involved in selling contraband, including drugs and drug paraphernalia, often conceal currency, property and items that evidence proceeds of their illegal activities or that have been used or are intended to be used to further their illegal activities.   Such items include United States and/or foreign currency; precious metals, valuable jewelry, artwork, electronics, collectibles, antiques; and/or financial instruments, stocks and/or bonds, all of which can constitutes evidence of drug proceeds or money laundering.   Your affiant knows that the courts recognize that unexplained wealth is probative evidence of crimes motivated by greed. Your affiant also knows that sellers of contraband, such as paraphernalia or drugs, often use proceeds from their illegal activities to purchase, acquire and/or lease real estate as well as personal property, including motor vehicles, jewelry and other items of value.   Indicia of acquisition, ownership, rental and/or possession of such property, in the form of, but not limited to, deed records, titles, registrations, purchase or sale invoices, escrow account records, mortgage receipts, rent or lease receipts, and utility billings are usually maintained at the residence or business of the drug trafficker or in concealed locations, such as safe deposit boxes or offsite storage.

70.     In order to prevent the tracing of the sources of their receipt of money, and their purchases and payments to third parties and to one another, sellers of drugs and drug paraphernalia often deposit and withdraw significant sums of currency in using their bank accounts; because of the frequency and circumstances of these deposits and withdrawals, they sometimes draw the attention and scrutiny of bank personnel and security officials, and trigger federal reporting requirements that mandate the filling out of forms known as "Currency Transaction Reports" or "CTR's."

71.     To avoid these currency reporting requirements, including the requirement of a CTR for any currency transaction greater than $10,000, sellers of drugs and drug paraphernalia may break up their deposits and withdrawals into smaller amounts, and/or spread them out over one or more days, or at different bank branches or banks.  Bank statements, deposit and withdrawal slips, and other evidence of the use of currency are likely to be found in businesses and residences of persons who seek to avoid scrutiny of their financial transactions.

72.     Sellers and manufacturers of contraband commonly maintain addresses or telephone numbers in books, papers, cell phones, or electronic storage devices which reflect names, addresses and telephone numbers of their associates and suppliers in the drug or drug paraphernalia business.

73.     Your affiant also knows that documents evidencing the proceeds of sales of contraband may be kept offsite from the business.  Evidence of such offsite storage may include the following: safety deposit box keys or records, records of wire transfers, commercial storage locker keys or records, certificates of deposit, and other items evidencing the obtaining, secreting, transfer, concealment or expenditure of proceeds acquired through the sale of contraband.

74.     Your affiant knows that it is common for operators of businesses, including businesses that engage in illegal activities, to maintain some of the aforementioned business records on computers and other electronic storage media, both in the businesses and in their personal residences.  For purposes of this affidavit, the terms computer and computer media are used to refer to the broad category of devices capable of electronic or digital storage or processing of information; including, but not limited to, desk top computers, lap tops, PDAs, iphones, cell phones, tablets, external storage devices, router modems and related peripherals.

75.     As described above and in Attachment B, this application seeks permission to search for records that might be found on the premises of OTHER WORLD GALLERY, a business located at 108 South 11th Street, Boise, Idaho, and the residence of CRYSTAL and THOMAS BLUMKE, located at                              Horseshoe Bend, Idaho, in whatever form they are found.  One form in which the records might be found is data stored on a computer's hard drive or other storage media.  Thus, the warrant applied for would authorize the seizure of electronic storage media or, potentially, the copying of electronically stored information, all under Rule 41(e)(2)(B).

76.     I submit that if a computer or storage medium is found on the premises of OTHER WORLD GALLERY, a business located at 108 South 11th Street, Boise, Idaho, and the residence of CRYSTAL and THOMAS BLUMKE, located at                              Horseshoe Bend, Idaho, there is probable cause to believe those records will be stored on that computer or storage medium, for at least the following reasons:

    a.  Based on my knowledge, training, and experience, I know that computer files or remnants of such files can be recovered months or even years after they have been downloaded onto a storage medium, deleted, or viewed via the Internet. Electronic files downloaded to a storage medium can be stored for years at little or no cost.  Even when files have been deleted, they can be recovered months or years later using forensic tools.  This is so because when a person "deletes" a file on a computer, the data contained in the file does not actually disappear; rather, that data remains on the storage medium until it is overwritten by new data.

b. Therefore, deleted files, or remnants of deleted files, may reside in free space or slack space—that is, in space on the storage medium that is not currently being used by an active file—for long periods of time before they are overwritten. In addition, a computer's operating system may also keep a record of deleted data in a "swap" or "recovery" file.

c. Wholly apart from user-generated files, computer storage media—in particular, computers' internal hard drives—contain electronic evidence of how a computer has been used, what it has been used for, and who has used it. To give a few examples, this forensic evidence can take the form of operating system configurations, artifacts from operating system or application operation; file system data structures, and virtual memory "swap" or paging files. Computer users typically do not erase or delete this evidence, because special software is typically required for that task. However, it is technically possible to delete this information.

d. Similarly, files that have been viewed via the Internet are sometimes automatically downloaded into a temporary Internet directory or "cache."

77.   As further described in Attachment B, this application seeks permission to locate not only computer files that might serve as direct evidence of the crimes described on the warrant, but also for forensic electronic evidence that establishes how computers were used, the purpose of their use, who used them, and when. There is probable cause to believe that this forensic electronic evidence will be on any computer in OTHER WORLD GALLERY, a business located at 108 South 11th Street, Boise, Idaho, and the residence of CRYSTAL and

Case 1:12-mj-07292-CWD *SEALED*   Document 2 (Court only)   Filed 05/09/12   Page 32 of 40

THOMAS BLUMKE, located at                    Horseshoe Bend, Idaho because:

a.   Data on the storage medium can provide evidence of a file that was once

on the storage medium but has since been deleted or edited, or of a deleted

portion of a file (such as a paragraph that has been deleted from a word

processing file). Virtual memory paging systems can leave traces of

information on the storage medium that show what tasks and processes

were recently active.  Web browsers, e-mail programs, and chat programs

store configuration information on the storage medium that can reveal

information such as online nicknames and passwords.  Operating systems

can record additional information, such as the attachment of peripherals,

the attachment of USB flash storage devices or other external storage

media, and the times the computer was in use. Computer file systems can

record information about the dates files were created and the sequence in

which they were created.

b.   Forensic evidence on a computer or storage medium can also indicate who

has used or controlled the computer or storage medium.  This "user

attribution" evidence is analogous to the search for "indicia of occupancy"

while executing a search warrant at a residence.  For example, registry

information, configuration files, user profiles, e-mail, e-mail address

books, "chat," instant messaging logs, photographs, the presence or

absence of malware, and correspondence (and the data associated with the

foregoing, such as file creation and last-accessed dates) may be evidence

of who used or controlled the computer or storage medium at a relevant

Case 1:12-mj-07292-CWD *SEALED*   Document 2 (Court only)   Filed 05/09/12   Page 33 of 40

time.

c. A person with appropriate familiarity with how a computer works can, after examining this forensic evidence in its proper context, draw conclusions about how computers were used, the purpose of their use, who used them, and when.

d. The process of identifying the exact files, blocks, registry entries, logs, or other forms of forensic evidence on a storage medium that are necessary to draw an accurate conclusion is a dynamic process. While it is possible to specify in advance the records to be sought, computer evidence is not always data that can be merely reviewed by a review team and passed along to investigators. Whether data stored on a computer is evidence may depend on other information stored on the computer and the application of knowledge about how a computer behaves. Therefore, contextual information necessary to understand other evidence also falls within the scope of the warrant.

e. Further, in finding evidence of how a computer was used, the purpose of its use, who used it, and when, sometimes it is necessary to establish that a particular thing is not present on a storage medium. For example, the presence or absence of counter-forensic programs or anti-virus programs (and associated data) may be relevant to establishing the user's intent.

f. I know that when an individual uses a computer to order drug paraphernalia over the internet, the individual's computer will generally serve both as an instrumentality for committing the crime, and also as a

storage medium for evidence of the crime. The computer is an instrumentality of the crime because it is used as a means of committing the criminal offense. The computer is also likely to be a storage medium for evidence of crime. From my training and experience, I believe that a computer used to commit a crime of this type may contain: data that is evidence of how the computer was used; data that was sent or received; notes as to how the criminal conduct was achieved; records of Internet discussions about the crime; and other records that indicate the nature of the offense.

78.    In most cases, a thorough search of a premises for information that might be stored on storage media often requires the seizure of the physical storage media and later off-site review consistent with the warrant. In lieu of removing storage media from the premises, it is sometimes possible to make an image copy of storage media. Generally speaking, imaging is the taking of a complete electronic picture of the computer's data, including all hidden sectors and deleted files. Either seizure or imaging is often necessary to ensure the accuracy and completeness of data recorded on the storage media, and to prevent the loss of the data either from accidental or intentional destruction. This is true because of the following:

a.    As noted above, not all evidence takes the form of documents and files that can be easily viewed on site. Analyzing evidence of how a computer has been used, what it has been used for, and who has used it requires considerable time, and taking that much time on premises could be unreasonable. As explained above, because the warrant calls for forensic electronic evidence, it is exceedingly likely that it will be necessary to

thoroughly examine storage media to obtain evidence. Storage media can store a large volume of information. Reviewing that information for things described in the warrant can take weeks or months, depending on the volume of data stored, and would be impractical and invasive to attempt on-site.

b.  Computers can be configured in several different ways, featuring a variety of different operating systems, application software, and configurations. Therefore, searching them sometimes requires tools or knowledge that might not be present on the search site. The vast array of computer hardware and software available makes it difficult to know before a search what tools or knowledge will be required to analyze the system and its data on the Premises. However, taking the storage media off-site and reviewing it in a controlled environment will allow its examination with the proper tools and knowledge.

c.  Variety of forms of electronic media. Records sought under this warrant could be stored in a variety of storage media formats that may require off-site reviewing with specialized forensic tools.

79.   Based on the foregoing, and consistent with Rule 41(e)(2)(B), when persons executing the warrant conclude that it would be impractical to review the media on-site, the warrant I am applying for would permit seizing or imaging storage media that reasonably appear to contain some or all of the evidence described in the warrant, thus permitting its later examination consistent with the warrant. The examination may require techniques, including but not limited to computer-assisted scans of the entire medium, that might expose many parts of a

hard drive to human inspection in order to determine whether it is evidence described by the warrant.

80.   Because several people may share the residence of CRYSTAL and THOMAS BLUMKE, located at                    Horseshoe Bend, Idaho; it is possible that the premises will contain computers that are predominantly used, and perhaps owned, by persons who are not suspected of a crime.  If it is nonetheless determined that that it is possible that the things described in this warrant could be found on any of those computers or storage media, the warrant applied for would permit the seizure and review of those items as well.

81.   OTHER WORLD GALLERY, a business located at 108 South 11th Street, Boise, Idaho, is a functioning business that conducts legitimate business and illegitimate business. The seizure of the business computers may limit the businesses' ability to conduct its legitimate business.  As with any search warrant, I expect that this warrant will be executed reasonably. Reasonable execution will likely involve conducting an investigation on the scene of what computers, or storage media, must be seized or copied, and what computers or storage media need not be seized or copied.  Where appropriate, officers will copy data, rather than physically seize computers, to reduce the extent of disruption.  If employees of the business so request, the agents will, to the extent practicable, attempt to provide the employees with copies of data that may be necessary or important to the continuing function of the business' legitimate business.  If, after inspecting the computers, it is determined that some or all of this equipment is no longer necessary to retrieve and preserve the evidence, the government will return it.

82.   Your affiant knows that documents and data evidencing the sale, offering for sale, or manufacturing of drugs or drug paraphernalia, use of the mails or other facilities in interstate

Case 1:12-mj-07292-CWD *SEALED*   Document 2 (Court only)   Filed 05/09/12   Page 37 of 40

commerce to transport drugs, drug paraphernalia and proceeds of drug and paraphernalia sales will be found in both the businesses selling the contraband and in the residences of involved people.  These documents and data occur in numerous forms, including the following:

a.   Business books and/or records evidencing the operation of an illegal drug paraphernalia operation, and/or the illegal manufacture, transportation and/or sale of items of drug paraphernalia, such as business ledgers, business journals, accounting records, accounts payable records, accounts receivable records, profit/loss records, customer lists, receipts, notes, correspondence, employee records, invoices, sales records, expense records, order forms, catalogues, advertisements, solicitations, brochures, photographs or representations of merchandise, evidence of credit card transactions,  and/or other business papers or documents;

b.   Financial books, records and/or items evidencing the obtaining, secreting, concealment, transfer, laundering and/or expenditure of proceeds acquired through the illegal manufacture, transportation and/or sale of items of drug paraphernalia, such as bank and/or financial statements and related records (deposit slips, withdrawal slips, canceled checks, passbooks, money drafts, letters of credit, money orders and/or cashier checks for any and all bank, financial and/or investment accounts); receipts; bills; invoices; documents related to asset purchases and/or ownership; bank safety deposit box records and keys; settlement sheets; closing statements; sales agreements; investment agreements; partnership agreements; and/or trust agreements;

Case 1:12-mj-07292-CWD *SEALED*   Document 2 (Court only)   Filed 05/09/12   Page 38 of 40

c.    Records or documents reflecting customers, suppliers, financial institutions, other
individuals and/or businesses related to the illegal manufacture, transportation
and/or sale of items of drug paraphernalia, including, address books, telephone
books, Rolodexes, indices and/or any papers reflecting names, addresses,
telephone numbers, pager numbers, fax numbers, email addressees, shipping or
receiving records, photographs, exposed film and the images contained therein, or
other such identifying information;

d.    Indicia of occupancy, residency, rental and/or ownership of the premises
described herein, such as utility and/or telephone bills; canceled envelopes; rental,
purchase or lease agreements; mortgages; and keys;

e.    Federal and state income tax returns, filed or not filed, for the above named
businesses, their owners, managers or employees, including supporting work
papers and documents, summary sheets, financial statements, and analyses used in
the preparation of the tax returns, which are evidence of proceeds of the drug
paraphernalia business;

f.    Documents indicating domestic and/or foreign travel, including airline tickets;
notes and travel itineraries; airline schedules; bills; charge card receipts; hotel,
motel, and car rental statements; correspondence with travel agencies and other
travel related business; airline, rent-a-car, and hotel frequent flier and user cards
and statements; passports and visas; telephone bills; photographs of domestic
and/or foreign locations; and/or papers relating to domestic and/or international
travel, which constitutes evidence of drug proceeds or money laundering;

Case 1:12-mj-07292-CWD *SEALED*   Document 2 (Court only)   Filed 05/09/12   Page 39 of 40

g.      Electronic documents and data found in any and all electronic devices which are capable of storing, analyzing, creating, displaying, converting, or transmitting digital, electronic or magnetic data, signals or impulses. All data, whether electronic, digital, magnetic or otherwise, which is stored, recorded or contained, in any manner, on any such devices. These devices include but are not limited to computers, computer components, computer peripherals, PDAs, word processing equipment, modems, monitors, printers, plotters, encryption circuit boards, optical scanners, internal and external hard drives or floppy drives, diskettes, electronic cameras, CDs and other disks, other related electronic devices and storage medium, audio and video tapes, CDs and DVDs, as well as fax machines and any interface connections, copying machines, cellular phones, car phones, and pagers; and,

h.      Any and all software, instructions, or programs stored in the form of electronic or magnetic media which are capable of being interpreted by a computer or related component. The items could include operating systems, application software, utility programs, compilers, interpreters, and any other programs or software used to communicate with computer hardware or peripherals either directly or indirectly via telephone lines, radio, or other means of transmission.

All of which constitute evidence of: conspiracy to sell, offer for sale, and transport drug paraphernalia in violation of Title 21, United States Code, Sections 846 and 863; selling, offering to sell, and transporting drug paraphernalia in violation of Title 21, United States Code, Section 863; investment of illicit drug profits in violation of Title 21, United States Code, Section 854; use of mails or other facilities in interstate commerce to transport drug paraphernalia in violation

of Title 21, United States Code, Section 863(a)(2); and money laundering in violation of Title 18, United States Code, Section 1956(a).

III.    **CONCLUSION**

Based upon the foregoing, I believe that there is probable cause to search the property identified in attached Exhibit A and B and seize the items identified in attached Exhibit C; said items are subject to seizure as evidence of the crimes set out above, and are also subject to seizure as items subject to forfeiture pursuant to the statutes set out above.

Further, your affiant sayeth naught.

Date: May ___9___, 2012

Niles L. Gooding
Special Agent
Drug Enforcement Administration

Subscribed and sworn to before me this ___9th___ day of May, 2012.

CANDY W. DALE, CHIEF
UNITED STATES MAGISTRATE JUDGE

38